Filed 4/21/26  P. v. Orellano CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336507 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA442339) |
| v. | |
| EDUARDO ORELLANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

In December 2015, defendant and appellant Eduardo Orellano and nine other members of the Mara Salvatrucha gang (MS-13) were charged with numerous felonies arising from conduct spanning two years.  In a bifurcated trial, a jury convicted defendant of first degree murder, two counts of conspiracy to commit murder, three counts of extortion, six narcotics offenses, and found true gang and firearm allegations, as well as multiple aggravating factors.  The trial court sentenced defendant to 107 years to life, plus nine years.

Defendant challenges his conviction on numerous grounds.  First, he contends that all gang-related enhancements must be reversed because the jury was not instructed on the organizational nexus element of the gang enhancement under amended Penal Code section 186.22, subdivision (b)[1] as clarified in *People v. Clark* (2024) 15 Cal.5th 743, 749 (*Clark*).  Defendant also argues the court failed to instruct the jury on attempted extortion as a lesser included offense of extortion.  In addition, defendant asserts the court committed prejudicial evidentiary error by limiting his cross-examination of a key prosecution witness, and by admitting gang evidence during the trial on the substantive offenses.  He also says substantial evidence is lacking with respect to the gang enhancements, the gang-related firearm enhancement, conspiracy to commit murder (count 9), the extortion counts (counts 13–15), and possession of methamphetamine for sale (count 22).  Finally, defendant says the minute order from the sentencing hearing and the abstract of judgment must be modified to conform to the trial court's oral pronouncement of sentence.

---

[1]     All further undesignated statutory references are to the Penal Code.

Because we are unable to conclude beyond a reasonable doubt that the omission of an instruction on the organizational nexus element of the gang allegations did not contribute to the verdict obtained, we reverse all gang enhancements under section 186.22, subdivision (b), the gang-related firearm enhancement on count 1 under section 12022.53, subdivisions (d) and (e)(1), and the gang-related indeterminate sentence imposed on count 13 under section 186.22, subdivision (b)(C)(4). We remand for resentencing and for further proceedings consistent with this opinion. We affirm the judgment of conviction in all other respects.

## FACTUAL AND PROCEDURAL SUMMARY

### 1. The charges

Defendant was charged with six felonies arising from events that occurred outside a nightclub in September 2013: one count of first degree murder (Pen. Code, § 187, subd. (a); count 1), four counts of premeditated attempted murder (§§ 187, subd. (a)(1), 664, subd. (a); counts 2–5), and one count of shooting at an occupied vehicle (§ 246; count 26). Count 1 concerned the fatal shooting of Edwin Jurado outside the El Cafetal nightclub. The attempted murder counts and shooting at an occupied vehicle count concerned shots fired at four individuals who attempted to intervene in the attack on Jurado.

The remaining charges against defendant arose from conduct that took place over several months in 2015, including two counts of conspiracy to commit murder (§ 182, subd. (a)(1); counts 8 & 9), attempted extortion (§ 524; count 10), conspiracy to commit extortion (§ 182, subd. (a)(1); count 11), four counts of extortion (§§ 518, 520; counts 12–15), two counts of selling/transporting cocaine (Health & Saf. Code, § 11352, subd. (a); counts 17 & 19), three counts of selling/transporting methamphetamine (Health &

3

Saf. Code, § 11379, subd. (a); counts 18, 20 & 21), and possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 22).

Two counts of conspiracy to commit murder included a plan to kill a rival gang member in Lafayette Park on September 27, 2015 (count 8), and another plan to kill an 18th Street gang member outside of a 7-Eleven store on September 28, 2015 (count 9). The three counts of extortion and five of the narcotics offenses (counts 17–21) involved use of a confidential informant, Oscar L., making controlled payments and drug purchases monitored by the Los Angeles Police Department (LAPD). The remaining narcotics offense (count 22) arose from events occurring at the time of defendant's arrest in December 2015. The prosecution elected not to proceed on counts 10, 11 and 12, so we do not discuss them further. Defendant was not named in counts 6, 7, 16, 23, 24 and 25.

The People alleged both gang and firearm use allegations. A gang allegation was alleged as to counts 1 through 9 and 26 under section186.22, subdivision (b)(1)(C)), and as to counts 10 through 15, and 17 through 22 under section 186.22, subdivision (b)(1)(A). Defendant was alleged to have personally used a firearm in the commission of count 22 (§ 12022, subd. (c)). A principal was alleged to have personally used and discharged a firearm during the commission of counts 1 through 5 and 26. (§ 12022.53, subd. (b)–(e)(1).) The People also alleged seven aggravating factors. (Cal. Rules of Court, rule 4.421(a)(1)–(4), (a)(8) & (b)(1).)

None of defendant's codefendants are parties to this appeal.

2.     **Jury trial on substantive offenses**

Trial on the substantive offenses was bifurcated from the gang-related allegations and the aggravating factors. We summarize some of the material facts for context and detail additional evidence, as necessary, in our discussion of the legal issues below.

## 2.1 The events at the El Cafetal nightclub in 2013

Eduardo Serrano, a security guard at a restaurant and nightclub called El Cafetal, described the events that occurred shortly before closing on September 28, 2013. Serrano testified that a fight broke out inside the club between Edwin Jurado and several individuals he recognized as regulars at El Cafetal, including defendant. Serrano asked the regulars to leave, and they did so. On their way out, one of the regulars said, "they were gonna pop him." Serrano told Jurado to stay inside as the others left, hoping to avoid further trouble. Jurado stayed at the El Cafetal about 45 minutes until Serrano and the rest of the staff were closing up sometime around 2:00 a.m. Within a few minutes after Jurado left the club, Serrano heard gunshots and went outside. Serrano saw a commotion at the street corner and then two cars speeding away. At that point, Serrano noticed someone lying in the street.

Four passersby in a car saw Jurado lying motionless on the ground while being kicked and punched by multiple attackers. They pulled over and one of the passengers, Cristian D., attempted to intervene. However, they fled after shots were fired at them. Cristian suffered a gunshot wound to his arm.

Dina P. and Carlos G. (aka Lil Husky) also testified to some of the events surrounding the murder of Jurado.

In 2013, Dina was dating Luis Ramos whose gang moniker was Pensativo. At that time, he was the shot caller for the Park View clique of MS-13 in Los Angeles. Dina cooperated with the police and testified about the Jurado murder in exchange for not being charged as an accomplice. Dina feared MS-13. She had family members who still lived in El Salvador, and Pensativo told her those family members would face consequences if she talked about what she knew. LAPD provided protection for Dina and relocated her as part of her agreement to testify about the Jurado

5

murder. Carlos testified he had been a member of MS-13 in 2013 but then moved out of state and left the gang. He agreed to cooperate with the LAPD about the Jurado murder, and eventually pled to voluntary manslaughter in return for a 13-year sentence.

Both Dina and Carlos testified that after leaving El Cafetal, everyone returned to an MS-13 hang-out called a "casita." They were angry about how things transpired at the club. Pensativo, defendant, and other members of the gang said Jurado had disrespected MS-13 and tried to start a fight. They suspected he was associated with 18th Street. Defendant and the others all insisted they had to go back to El Cafetal and teach the guy a lesson. Defendant said something to the effect that things could not be left that way. Defendant, Pensativo, Carlos, and another member of the gang called Hyper went to get guns hidden in the bathroom of the casita. Defendant grabbed one of the guns, but Pensativo said it was Carlos's "time to shine" and handed the gun to Carlos, and another one to Hyper. Pensativo also took a gun for himself.

Defendant, Pensativo, Dina, Carlos and several others drove back to El Cafetal in multiple cars. They found Jurado alone outside of the nightclub. Defendant and several others started kicking and hitting Jurado, and then Pensativo and Hyper shot him. After the shooting, they fled in their respective cars and returned to the casita where they celebrated. Carlos testified that everyone, including defendant, appeared happy. They were all throwing gang signs, and saying the murder had been for "la bestia," meaning for the gang.

Shortly thereafter, Pensativo left Los Angeles and passed control of the Park View clique to defendant. Carlos also left Los Angeles after the murder because he was not comfortable with the gang lifestyle.

In late 2013, Detective Carlos Camacho of the LAPD's gang homicide unit took over the investigation of the El Cafetal murder. By early 2015, the El Cafetal murder remained unsolved. Detective Camacho was contacted by Detective Frank Flores, who told him he had a confidential informant named Oscar who was willing to work with him regarding the MS-13 gang.

**2.2 Informant Oscar L.**

Oscar was a key witness for the prosecution on the extortion and narcotics counts, as well as on the conspiracy to commit murder charged in count 9.

Oscar grew up in El Salvador and was familiar with MS-13 as an El Salvadoran gang. He believed they were violent and routinely killed rivals such as members of the 18th Street gang, which also had a presence in El Salvador. Oscar first came to the United States in 2005 as an adult. He testified he was never a member of any gang.

When Oscar arrived in Los Angeles, he settled in the MacArthur Park neighborhood. He started illegally selling DVD's and other items on the street which led to his arrest, and brought him into contact with Detective Flores. Oscar offered to work as an informant for Detective Flores and did so for several years. In 2012, Oscar went back to live in Central America for almost two years but kept in contact with Detective Flores. He returned to the United States in 2014.

In the fall of 2014, Oscar was approached by defendant and another MS-13 gang member called Lil Lifer. Defendant identified himself as Demon Killer and said he was the shot caller for the Park View Locos. Oscar knew the Park View clique of MS-13 was the gang that controlled his neighborhood, and he knew they were demanding extortion payments from several of his friends. Defendant told Oscar he had to pay money to the Park View clique

7

like his friends.  Oscar did not argue and paid him the money that day because he believed he would be killed if he did not.

Thereafter, the gang demanded $150 per week.  Sometimes defendant would call and say he was sending Lil Lifer to collect. But most of the time defendant came to collect the money, and usually did so in the company of another MS-13 gang member. By March 2015, defendant was demanding $350 per week.  Oscar was scared of MS-13 and therefore always made the payments. One time when he was late, defendant told him "I'm not going to be talking to you anymore, you fagot [*sic*].  You know how things go, you son of a bitch."

Around this same time, defendant demanded that Oscar, who had his own car, start driving defendant and other members of the Park View clique around whenever they needed it.  Oscar drove defendant to meetings with other MS-13 gang members in places like Las Vegas and Mendota in Fresno County.  Oscar did not refuse because defendant said they would kill him if he did not agree.

In March 2015, Detective Flores put Oscar in touch with Detective Camacho.  Oscar signed an agreement with Detective Camacho to act as his confidential informant.  The contract did not include any benefits or promise to pay Oscar.  Oscar agreed to report information about extortion payments, homicides, or other activities of MS-13.  Oscar was also required to consent to be searched on demand and have his cell phone monitored by the LAPD.  Oscar worked with Detective Camacho until December 2015 when the arrests in this case were made.

Oscar testified that the violence in his country because of MS-13 made him unhappy and angry, and even though he was scared for his life, he wanted to help the LAPD in its investigation of MS-13.  He said "[i]t was a matter of principle."

As part of his informant work, Oscar wore a hidden camera and a recording device, and participated in controlled drug buys. In June and July 2015, Oscar made multiple controlled buys of methamphetamine and cocaine. The LAPD gave Oscar the money for the purchases and after he completed those purchases, he returned the drugs to the LAPD. Detective Camacho corroborated that Oscar turned over the narcotics he purchased during the controlled buys.

Oscar also made several extortion payments to defendant while outfitted with the hidden camera and recording device. At some point, the Department of Homeland Security became involved in the investigation with the LAPD. Oscar testified he was given money by the LAPD, and sometimes by the Department of Homeland Security, and that he made controlled extortion payments on July 24, 2015, August 7, 12 and 21, 2015, September 25, 2015, October 8 and 23, 2015, and November 3, 5 and 30, 2015.

In November 2015, Oscar was still receiving threats from members of MS-13. On November 30, 2015, Oscar received the following text: "You son of a bitch, you mother fucker, if you don't face us and pay the clique, this is the last time we're going to talk to you. Do you understand, you son of a bitch?" Oscar felt "threatened" and "degraded." Oscar made his last extortion payment on December 8, 2015.

From spending time with defendant and other members of the Park View clique, Oscar learned that a "destroyer" was "a safe place to hide"—basically an apartment where MS-13 members could safely hang out together. Oscar said defendant was in charge of the destroyer on San Marino Avenue in Los Angeles. Oscar also testified it was a "priority" of the Park View clique to kill 18th Street gang members. He heard defendant say several times that

9

he wanted to kill rival gang members from 18th Street, Crazy Riders, and Florencia.

Oscar also testified to the events of September 28, 2015 at a 7-Eleven store (count 9). Oscar was wearing a recording device at the time which captured numerous statements by defendant. Video footage from surveillance cameras also captured some of the events.

Oscar testified he had driven defendant, Jose Rodriguez (aka El Effecaz), and Lil Daygo to a 7-Eleven store. Oscar believed they were out looking for members of 18th Street. While they were inside waiting to pay for some drinks, a man walked in with a visible 18th Street tattoo on his arm. The man with the tattoo and defendant both stared at each other in a "defiant" way, and Oscar believed there was "going to be trouble." Oscar said he knew he had to "make a scene" inside the store that would cause the clerk to kick them out and call the police, "otherwise, I was afraid they would kill that person."

Oscar started to verbally taunt the 18th Street gang member, and defendant told him to calm down. Oscar understood defendant told him to calm down because defendant did not want to do anything inside the store in front of other people and possibly in front of security cameras. Defendant wanted to wait to attack the victim outside of the store where they were more likely to get away with it. They returned to the car, and defendant and Rodriguez retrieved weapons from the trunk. Before they could do anything, the store clerk came outside and told them she had called the police.

While they drove away from the store, Oscar's recording device captured defendant scolding Oscar for making a scene inside the 7-Eleven. Defendant could be heard telling Oscar that they did not want to just beat up the victim, "We want to kill him. Don't you understand, asshole?" Oscar said defendant told him that if he had just kept quiet inside the store, they could have killed the guy

10

outside. Oscar reported the incident to Detective Camacho a couple of days later.

### 2.3 Other evidence

Officer Tomas Perez testified to his experience and knowledge regarding the MS-13 gang in Los Angeles, their claimed territory, and their customary gang symbols and signs, including use of devil horns and references to "la bestia" which was a reference to the gang. He explained the general structure of MS-13, with leadership in Central America, and cliques in the United States, each with their own hierarchy of control.

The Park View clique often socialized at apartments called casitas. They referred to stash houses as "destroyers." Carlos corroborated this testimony, explaining that the Park View clique used destroyers as safe places to store guns and narcotics. Carlos also explained that the 18th Street gang was the main rival of MS-13, but that if any rival gang member was found in MS-13 territory, there would be "violence." They were willing to kill over territory. Officer Perez provided similar testimony about MS-13's willingness to use violence against rivals.

Detective Flores obtained authorizations to monitor various phone numbers. The wiretap authorizations covered phones belonging to defendant and several other MS-13 gang members. In many of the calls, defendant discussed gang business with other members and referred to himself by his moniker, Demon Killer.

Several of the recordings contained conversations discussing a plan to murder a rival gang member in Lafayette Park on September 27, 2015 (count 8). Defendant was told by a Park View gang member known as Desconosido that a rival was trespassing in Park View territory. Desconosido explained he was unarmed and asked for permission to retrieve a gun ("let me borrow a piece"). Defendant told him another gang member would meet him to give

him a gun.  When Desconosido arrived at the meet-up location, he saw police officers nearby and fled before collecting the gun.

Defendant was arrested in December 2015, after barricading himself inside the clique's destroyer located on San Marino Avenue. Firearms, narcotics, and other items were located during the search of the destroyer after defendant was detained.

### 3. Trial on the gang-related allegations and aggravating factors

The prosecution presented certified records of conviction on four different criminal cases as evidence of the predicate offenses by MS-13 gang members.  Detective Camacho attested to three of the prior offenses.  Case No. BA420990 involved a fatal shooting in 2013 by MS-13 gang members Edward Chevac, Wendy Villalta, and Kelvin Velado.  Velado and Chevac were convicted by a jury of first degree murder with a gang enhancement in 2016.  Villalta pled to voluntary manslaughter.  Case No. BA442339 involved an attempted murder in June 2015 by MS-13 gang members Mauricio Campos (aka Lil Daygo), Rodriguez (aka El Effecaz), and Miguel Alfaro (aka Lil Bad).  Campos was convicted by a jury of attempted murder in 2023.  Rodriguez and Alfaro pled to attempted murder. The third predicate offense, case No. BA442339, involved a fatal stabbing in September 2015 by three MS-13 gang members.  One of the three, Samantha Hernandez, was convicted of murder in 2018.

Detective Elliott Kane testified about the fourth predicate offense, case No. BA410841.  Like the first predicate offense, it also involved Chevac, who committed an attempted murder with gang members Jose Efrain Ruiz (aka Flash) and Moreno Ruben Alvarado (aka Chele).  All three were convicted of premeditated attempted murder with a gang enhancement.

Officer Daniel Cardenas testified as the prosecution's gang expert.  He summarized the gang signs, tattoos, and other symbols

commonly associated with MS-13, and the territory claimed by MS-13 in Los Angeles, including MacArthur Park and Lafayette Park. He stated his opinion that MS-13 sees all other Hispanic gangs as rivals, but identified 18th Street and Crazy Riders as two main rivals with nearby territory. Officer Cardenas described MS-13 as a large organization with nationwide membership estimated at 30,000 to 50,000, with approximately 1,000 of those members in the greater Los Angeles area. Between 2013 and 2015, the Park View clique had approximately 30 to 50 active members. Most of the main leaders of the gang are in Central America with cliques in the United States generally run by shot callers. MS-13 controlled its territory with violence. The gang's primary activities included murder, attempted murder, extortion, robbery, and narcotics sales. Officer Cardenas said one of the main operational features of MS-13 was the use of violence against rivals. Officer Cardenas stated his opinion, based on hypotheticals, that the charged crimes were committed for MS-13's benefit.

### 4. Verdict and sentencing

Defendant was convicted of first degree murder (count 1), two counts of conspiracy to commit murder (counts 8 & 9), three counts of extortion (counts 13–15), and six narcotics offenses (counts 17–22). He was acquitted of the four counts of attempted murder (counts 2–5) and shooting at an occupied vehicle (count 26).

As to count 1, the jury found true the allegation that a principal personally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b) through (e)(1). As to count 22, the jury found true the allegation that defendant personally used a firearm in the commission of the offense within the meaning of section 12022, subdivision (c). The jury also found true the gang allegation as to all counts. (§ 186.22, subd. (b)(1)(A) & (C).) All aggravating factors were found true.

13

The court orally pronounced sentence on January 18, 2024, sentencing defendant to 107 years to life, plus nine years, calculated as follows: 25 years to life on count 1 (murder), plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subds. (d) & (e)(1)); a consecutive term of 25 years to life on each of counts 8 and 9 (conspiracy to commit murder); a consecutive term of seven years to life on count 13 (extortion); and a consecutive two-year middle term on count 22 (possession for sale), plus a consecutive three-year middle term for the gang enhancement (§ 186.22, subd. (b)(1)(A)), and a consecutive four-year middle term for the firearm use enhancement (§ 12022, subd. (c)).

The court stayed the gang enhancements on counts 1, 8, 9 and 13, as well as the firearm use enhancements under subdivisions (b) and (c) of section 12022.53 on count 1. On each of counts 17 through 21, the court imposed a four-year middle term, plus a three-year middle term for the gang enhancement. The court ordered the terms on counts 17 through 21 to run concurrently to count 22. In pronouncing sentence, the court did not mention counts 14 and 15. The court awarded defendant 2,955 actual days of presentence custody credits.

The minute order for the sentencing hearing and the abstract of judgment reflect the court's oral pronouncement of judgment. However, both documents also include additional terms the court did not orally impose: a seven-years-to-life indeterminate term on each of counts 14 and 15 (extortion), concurrent to counts 1, 8, 9 and 13, with the gang enhancements stayed as to both counts 14 and 15.

This appeal followed.

14

## DISCUSSION

1. **The gang enhancements, the gang-related firearm enhancement on count 1, and the gang-related indeterminate term on count 13 must be reversed**

Defendant contends the jury was not instructed on the organizational nexus element of the gang enhancement as clarified in *Clark*, *supra*, 15 Cal.5th 743. Defendant says this instructional error requires reversal of all the gang-related sentencing enhancements. The People concede the jury was not instructed on the organizational nexus element, but contend any instructional error was harmless beyond a reasonable doubt. As we explain, we conclude the gang enhancements, the gang-related firearm enhancement on count 1, and the gang-related indeterminate term on count 13 must be reversed.

### 1.1 Assembly Bill No. 333

*Clark* acknowledged that the Legislature, in passing Assembly Bill No. 333 (2021–2022 Reg. Sess.), expressed concern that the California Street Terrorism Enforcement and Prevention Act (STEP Act) (§ 186.20 et seq.) had "strayed" from its original purpose. (*Clark*, *supra*, 15 Cal.5th at p. 760.) Assembly Bill No. 333 therefore created various amendments to the STEP Act to better "align with its original intent: to focus on the threats posed by organized criminal street gangs." (*Id.* at p. 761.) The amendments to the statutory language were "made in service of the Legislature's broader goal of differentiating between the threat posed by organized groups collectively engaged in criminal activity, versus the threat posed by individual, loosely connected persons who happen to commit crimes." (*Ibid.*)

Assembly Bill No. 333 substantially narrowed the definition of a criminal street gang and made numerous amendments to the statutory language. (*Clark*, *supra*, 15 Cal.5th at p. 752; *People v.*

15

*Cooper* (2023) 14 Cal.5th 735, 738 (*Cooper*).) The specific amendment relevant here concerns the definition of criminal gang activity. Under the amended language, the prosecution must now present evidence that the members of the gang " '*collectively* engage[d]' " in a pattern of criminal activity, as opposed to the former language under which individual criminal action by members was sufficient. (*Clark*, at p. 752; § 186.22, subd. (f).)

*Clark* interpreted this new language and held that collective engagement in section 186.22 now requires evidence demonstrating "a nexus between the individual predicate offenses and the gang as an organized, collective enterprise. This organizational nexus requirement is satisfied by showing a connection between the predicate offenses and the organizational structure, primary activities, or common goals and principles of the gang." (*Clark*, *supra*, 15 Cal.5th at p. 749.) *Clark* emphasized that while the evidence necessary to establish an organizational nexus might often overlap with the evidence used to demonstrate how a predicate offense commonly benefitted the gang, the inquiries were nonetheless "conceptually distinct." (*Id*. at p. 763.)

In response to *Clark*, CALCRIM No. 1401 was amended to reflect this new element. It now includes the following language: "As used here, members *collectively engage in or have engaged in* a pattern of criminal gang activity when the crimes that make up the pattern of criminal gang activity can be connected to the gang as a whole. Collective engagement requires a connection between the crimes and the gang's organizational structure or manner of governance, its primary activities, or its common goals and principles." (*Ibid*.)

### 1.2 Analysis

Defendant's trial took place several months before the Supreme Court issued its decision in *Clark* and before CALCRIM

No. 1401 was amended. The jury was therefore not instructed on the organizational nexus element as interpreted in *Clark*, and the People do not argue the pre-*Clark* instruction given below was adequate.

When a jury instruction omits an element of an offense or special allegation, it impermissibly lessens the prosecution's burden of proof and implicates the defendant's federal due process rights. (*Cooper*, *supra*, 14 Cal.5th at p. 742.) When such an instructional error occurs, we assess prejudice under the federal harmless error standard of *Chapman v. California* (1967) 386 U.S. 18. (*Cooper* at p. 742 [concluding *Chapman* applied in assessing prejudice where instructions omitted new element of gang enhancement that common benefit to gang must be more than reputational].)

In this context, our review under *Chapman* requires an examination of the record in its totality. (*People v. Mil* (2012) 53 Cal.4th 400, 417.) If, at the end of that examination, we cannot conclude beyond a reasonable doubt the jury verdict would have been the same absent the error, the instructional error was not harmless. (*Ibid*.) Put another way, the error was prejudicial if we determine the " ' "record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*Ibid*.; accord, *Cooper*, *supra*, 14 Cal.5th at pp. 742–743.)

Defendant argues there was limited testimony about the predicate offenses and how they related, if at all, to MS-13 as a criminal organization. He also contends that because he did not have the benefit of the clarification provided by *Clark* at the time of trial, he was denied the ability to tailor his defense and his cross-examination of the prosecution witnesses on the organizational nexus element, and to otherwise present evidence demonstrating the nexus was absent. The People assert the instructional error was harmless because there was strong evidence that two of the

17

predicate offenses had the requisite organizational connection since they both concerned the killing of rivals to MS-13. They also note the other two offenses involved attacks on individuals believed to have some association or connection to rival gangs.

A review of the record reveals the testimony regarding the factual underpinnings of each predicate offense was conclusory and brief. The testimony of Detectives Camacho and Kane was focused instead on setting forth the date of each offense, the individual defendants involved, the date of conviction by trial or plea, and in attesting to the certified records documenting those convictions. The detectives were then asked just one question about the "general circumstances" of the offense, to which they provided a one or two sentence response.

As to case No. BA442339, Detective Camacho testified that three MS-13 gang members were purportedly "hunting for rivals" when they came upon the victim whom they believed was a member of the rival 18th Street gang, and attacked him with a machete, causing serious but nonfatal injuries. Case No. BA442339 involved three MS-13 gang members fatally stabbing a victim, who had a Florencia gang tattoo on his stomach, in Lafayette Park. Case No. BA420990 involved a fatal shooting outside a known MS-13 casita. Detective Camacho explained the victim had been talking about a cousin who was a member of the Playboys gang, and two MS-13 gang members took the victim outside and shot him multiple times. Detective Kane testified to the final predicate offense, case No. BA410841. He said it also involved three MS-13 gang members, all of whom were convicted of attempted murder, for the nonfatal shooting of a 17-year-old female believed to associate with members of the 18th Street gang.

The People correctly point out there was testimony, including from Officer Cardenas, Carlos and Oscar, that attacking and even

18

killing rival gang members was one of the regular activities or goals of MS-13, and that *Clark* explained such evidence may be used to prove the requisite organizational nexus.  (*Clark*, *supra*, 15 Cal.5th at p. 762.)  But *Clark* also explained the phrase collective engagement "calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang works together *as a gang*.  It calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole."  (*Ibid*.)

Here, no other evidence was presented illuminating the factual circumstances of the two predicate offenses against gang rivals on which the People chiefly rely.  There was no evidence any of the predicate offenses was directed by a shot caller.  Regarding the killing in Lafayette Park, there is nothing in the record dispelling the possibility it was undertaken on the spur of the moment by the individual gang members involved solely due to a personal grievance or perceived act of disrespect, as opposed to crimes committed as part of MS-13's collective criminal activities.  Combined with the lack of an instruction on the organizational nexus element to focus the jury on consideration of that specific issue, as is now required by the statutory language, we cannot conclude the error here was harmless.

We do not suggest the scant evidence of an organizational nexus was the result of any failings by either party.  The evidence was presented in a manner consistent with how predicate offenses were proved up prior to *Clark*.  Nevertheless, the lack of substantial evidence connecting the predicate offenses to the larger structure and activities of MS-13 as a whole is notable.  Given the present record, we are unable to conclude beyond a reasonable doubt that the lack of instruction on the organizational nexus element did not contribute to the verdict obtained.  Accordingly, we reverse the gang

enhancements and remand for further proceedings consistent with this opinion. (*Clark*, *supra*, 15 Cal.5th at p. 764.) In the event the People choose to retry the gang allegations on remand, the People are free to offer additional evidence in support of the gang allegations. (*Id*. at pp. 764–765.)

Both the gang-related firearm enhancement imposed on count 1 under section 12022.53, subdivisions (d) and (e)(1), and the gang-related seven-years-to-life indeterminate term on count 13 are contingent on a valid true finding on the gang allegations. (See *Cooper*, *supra*, 14 Cal.5th at p. 746; § 186.22, subd. (b)(4)(C).) We therefore must also reverse the firearm enhancement on count 1 and the sentence on count 13, and remand for resentencing.

**2.      Cross-examination of Oscar**

Defendant next contends his constitutional rights to due process and to confront the witnesses against him were violated by the trial court's rulings limiting his ability to cross-examine Oscar regarding all the benefits he may have received working as an informant, both on this case and in his previous work. Defendant argues the trial court's rulings were prejudicial, cloaking Oscar with a level of credibility to which he was not due.

There is no question defendant had the right to cross-examine Oscar about whether he had been offered inducements to testify, expected benefits from giving his testimony, or otherwise had a motive to lie. (*People v. Pearson* (2013) 56 Cal.4th 393, 455 (*Pearson*); see also Evid. Code, § 780, subd. (f).) Exposing a witness's potential for bias and fabrication has long been recognized as one of the most important functions of cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679.)

However, it is equally true the trial court was vested with broad discretion to impose reasonable limitations on defendant's cross-examination without offending the constitution. (*People v.*

*Contreras* (2013) 58 Cal.4th 123, 152; *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679.) " ' "Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." ' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1292.)  The Sixth Amendment guarantees a defendant "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Van Arsdall*, at p. 679.)

We review the trial court's evidentiary rulings in this context under the deferential abuse of discretion standard.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [discretion abused only where exercised in an arbitrary, capricious, or patently absurd manner that resulted in a "manifest miscarriage of justice"].)  Moreover, as a general rule, the application of " ' "the ordinary rules of evidence do not impermissibly infringe on [a defendant's] right to present a defense." ' " (*People v. Gurule* (2002) 28 Cal.4th 557, 620.)

In order to establish a prejudicial abuse of discretion that violated his Sixth Amendment right to confrontation, defendant was required to affirmatively show the trial court's order limiting or precluding cross-examination left the jury with " 'a significantly different impression' " of Oscar's credibility.  (*Pearson*, *supra*, 56 Cal.4th at p. 455, quoting *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680.)  Otherwise, " ' "the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." ' " (*Pearson*, at pp. 455–456; accord, *People v. Gonzalez* (2021) 12 Cal.5th 367, 406.)  We conclude defendant has not shown any of the challenged rulings constituted an abuse of discretion or a violation of his Sixth Amendment rights.

21

## 2.1 Questions about immigration benefits

Defendant's main contention is that he was precluded from asking Oscar whether he was legally in the United States, and whether he was promised or expected favorable immigration benefits as a result of assisting the LAPD as a confidential informant.

In response to Oscar's denials about receiving any money or benefits from the LAPD, defense counsel asked, "So you were willing to risk your life to assist them in investigations for nothing?" Oscar responded, in relevant part, that he had been "waiting for this moment" to testify in court. "I can explain to you the benefits that I have received as a result of this operation. May I explain that to you, sir?"

The court interrupted and told defense counsel to ask the questions. Counsel asked, "What benefits have you received?" Oscar began to respond with a statement that he believed the police in the United States knew how to properly investigate gangs. The court told counsel to "ask another question."

Defense counsel did not rephrase but switched to another line of questioning focused on Oscar's sources of income. During this colloquy, Oscar mentioned returning to Central America for a couple of years and then coming back to the United States. Defense counsel asked Oscar if he was in the United States legally. The court told counsel to move on to another subject and they would discuss that issue at the end of the day.

Later, outside the presence of the jury, defense counsel conceded that asking about a witness's immigration status is normally not an appropriate question but that it was appropriate in this case, because if Oscar was able to avoid deportation by helping the police, that would be a powerful motivation for him to lie or fabricate his testimony. Defense counsel offered only his theory

that Oscar received some sort of immigration benefit for his work. The prosecutor responded it was not an appropriate line of questioning because there was no evidence of any agreement regarding immigration benefits. The prosecutor pointed out the only evidence was that Oscar had signed an agreement with the LAPD to be an informant that promised him nothing.

The court ruled defendant could not ask about Oscar's immigration status. Citing Evidence Code section 352, the court explained there was no evidence of any agreement that Oscar had with any entity that he would not be deported if he agreed to act as a confidential informant, and he had repeatedly denied receiving any benefits from the LAPD for agreeing to be an informant. The court also noted that Oscar was working for the LAPD, and it had no authority to deport Oscar or to promise him immigration benefits.

Defendant says the court's ruling constituted an abuse of its discretion, relying on *People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260 (*Castaneda-Prado*). There, the defendant sought to question a victim about whether she was " 'pursuing immigration relief' " based on her accusations of sexual abuse. (*Id.* at p. 1271.) At the preliminary hearing, the victim was asked about a declaration she filed in support of a restraining order against the defendant. The victim testified she was a citizen but that she filed the declaration because she hoped it would help her mother obtain a U visa. (*Id.* at pp. 1271–1272, 1286.) A U visa is a type of temporary visa available to a narrow class of noncitizen victims of certain qualifying crimes to enable them to assist law enforcement in investigating or prosecuting that crime. (See generally *Hyoun Kyung Lee v. Holder* (9th Cir. 2010) 599 F.3d 973, 974; 8 U.S.C. § 1101(a)(15)(U)(i).) During her testimony at the preliminary hearing, the victim denied she fabricated any allegations against

the defendant in order to help her mother obtain the visa. (*Castaneda-Prado*, at p. 1272.)

In concluding the trial court abused its discretion by precluding the defendant from cross-examining the victim on this point, *Castaneda-Prado* emphasized the victim had "*admitted*" in prior testimony that she provided the declaration in the hope it would help her mother get the visa. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1286.) "Nothing else was necessary to provide a good faith basis to cross-examine on the issue at trial." (*Ibid*.) The court also explained that because there was no physical evidence of abuse, the prosecution's case turned "almost entirely" on the victim's credibility. (*Id*. at p. 1287.)

The circumstances here are not similar. Despite defendant's assertion to the contrary, Oscar did not fail to answer the questions posed to him about the benefits received. The record shows that Oscar responded several times, both on direct and during cross-examination, that he did not receive any money or benefits from the LAPD for being a confidential informant. This fact was corroborated by Detective Camacho and Detective Flores. Oscar also denied receiving any inducements or benefits from the District Attorney's Office for testifying in court.

Oscar admitted the one benefit he did receive was the payment of $25,000 from the Department of Homeland Security in early 2016 after his work was completed. He otherwise consistently testified he did not receive any other benefits and that helping the LAPD investigate MS-13 was a matter of principle to him. Nothing in his testimony suggested he was hoping to receive immigration benefits in consideration for acting as a confidential informant. Moreover, unlike *Castaneda-Prado*, while Oscar was an important witness for the prosecution on several of the counts, there was

substantial corroboration of his testimony and significant evidence offered through other witnesses.

Defendant has not shown the court's exercise of discretion on this issue was arbitrary and capricious. However, even assuming solely for the sake of argument that the court should have allowed some questioning of Oscar as to whether he expected or was promised immigration benefits for his informant work, defendant has not shown prejudice.

Defendant argues the court's ruling limiting his cross-examination was prejudicial because Oscar offered purportedly "damning" testimony that killing rivals, particularly 18th Street gang members, was a priority for MS-13. Defendant's argument would be more compelling if Oscar had been the only witness who testified about the Park View clique's use of violence against rivals. But Oscar's testimony in this regard was corroborated by multiple witnesses, including Carlos, Dina, and Officer Perez. Much of what Oscar attested to was also captured on recording devices he wore as a confidential informant, including defendant's own words about wanting to kill the 18th Street gang member at the 7-Eleven store.

In addition, defendant had the opportunity to cross-examine Oscar on the $25,000 payment he admittedly received and to otherwise attempt to call into question the credibility of his testimony that he acted as an informant without the promise of any other benefits—a point counsel developed at length during closing argument. Oscar was also questioned about his prior conviction for illegally selling items on the street, and defendant obtained a stipulation from the prosecutor regarding Oscar's complete criminal record, including a then-pending felony case for being a felon in possession of a firearm and domestic abuse. Given this evidence, we are not persuaded a reasonable jury would have formed a significantly different impression of Oscar's credibility had

defendant been able to ask him questions about the possibility he was promised immigration benefits for working as an informant.

### 2.2 Questions about informant work on other cases

Defendant also contends the court improperly sustained objections to questions about Oscar's prior informant work on other cases with Detective Flores.

Oscar testified at some length about his work with Detective Flores. He admitted he initiated the conversation with Detective Flores, sometime in 2008, asking about getting a "job" as an informant. He said his work with Detective Flores involved other gangs and included testifying in court about a homicide. Oscar said he was not promised or given benefits for any of this work. Oscar further explained that after he started working with Detective Flores, and because of the testimony he had given in court, he could no longer be seen in MacArthur Park as it was too dangerous.

On cross-examination, defense counsel asked Oscar: "So you were an informant in other cases, and people on the street were aware of that?" The prosecutor objected on relevance grounds. The court sustained the objection, noting the question also called for speculation. Defense counsel's question was poorly phrased, and we find no error in the court's ruling. Defense counsel did not follow up with a rephrased question.

Instead, defense counsel moved on to a line of questions regarding how Oscar earned his income, apparently attempting to elicit how he was able to make the large, weekly extortion payments if he was not receiving money from the LAPD or the Department of Homeland Security, and he was also no longer selling things in MacArthur Park. Oscar responded that he worked as a gardener and a day laborer; he lived alone and did not have a family to support. Oscar conceded that before 2012, while he was still involved in selling false identification documents, the LAPD did not

arrest him for selling those documents, nor did the LAPD confiscate any of the money he received from those sales.  Other than the one objection noted above, defendant points to no other ruling by the trial court limiting his ability to cross-examine Oscar about these issues.

### 2.3  Questions about selling drugs

Defendant concedes in his reply brief the court did not preclude cross-examination on this subject but only sustained an objection as to the form of one question on this topic.

### 3.  Admission of gang evidence on substantive offenses

Defendant argues his constitutional rights were also violated by the admission of prejudicial gang evidence during trial of the substantive offenses.  We review the trial court's ruling on this evidence under the deferential abuse of discretion standard. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*).)  We are not persuaded there was any abuse in the admission of this evidence.

When trial of a gang allegation is bifurcated from the trial of the substantive offense, the prosecution nonetheless retains the right "to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.)  It is well-settled that evidence of a " 'defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Ibid*.)

After ordering the gang allegations bifurcated under section 1109, the trial court granted the prosecution's motion to present gang evidence during the trial of the substantive offenses,

including on the issues of motive and intent. In allowing such evidence, it was incumbent on the trial court to scrutinize the proffered evidence before admitting it because of its tendency to be inflammatory. (*McKinnon*, *supra*, 52 Cal.4th at p. 655.) However, it is well-settled that evidence relating to motive is generally admissible. " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*Ibid*.)

The trial court acted well within its discretion in admitting the gang evidence here as it was relevant to motive for all of the charged offenses. It was also relevant on additional grounds. For instance, the testimony and evidence regarding gang territory, MS-13's use of gang symbols related to the devil and the phrase "la bestia," and the gang's propensity for violence against gang rivals was relevant to proving intent for the Jurado murder and the two counts of conspiracy to commit murder (counts 8 & 9). The wiretap evidence, which included phone calls between defendant and other gang members referencing gang business and uncharged offenses, was relevant to establish defendant's leadership role in the Park View clique. Defendant's status in the gang as a shot caller was relevant, at a minimum, to establishing his guilt under aiding and abetting and conspiracy theories on those counts as to which he was not the direct perpetrator. That same evidence, along with the testimony regarding the gang's maintenance of stash houses known as casitas and destroyers, was relevant to establishing defendant's control and possession of one of the destroyers in proving count 22.

While the court allowed the prosecution to present a significant amount of gang evidence through multiple witnesses, it also imposed limitations and precluded some of the testimony and evidence proffered by the prosecution as cumulative, including a

28

number of the wiretap calls discussing uncharged offenses. Furthermore, the court instructed with CALCRIM No. 1403 which told the jury, in relevant part, it could consider the gang evidence only for limited purposes, including whether defendant "acted with the intent, purpose, and knowledge that are required to prove the crimes charged; [¶] . . . [¶] [whether defendant] had a motive to commit the crimes charged" and to assess the credibility of witnesses. The instruction also told the jury it "may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume, absent evidence to the contrary, that jurors understand and follow the trial court's instructions on the law. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

Defendant briefly argues in the alternative that if we conclude there was no abuse of discretion, then we should find his trial counsel provided ineffective assistance. The trial court properly admitted the gang evidence. Defense counsel was not ineffective for failing to assert futile objections that would have been properly overruled.

## 4. Failure to instruct on attempted extortion

Defendant contends the trial court committed instructional error by failing to sua sponte instruct on attempted extortion as a lesser included offense of extortion in counts 13, 14 and 15. Our review is de novo. (*People v. Wilson* (2021) 11 Cal.5th 259, 295 (*Wilson*).) We conclude any instructional error was harmless.

The trial court in a criminal case has a sua sponte duty to instruct "on all lesser included offenses the evidence warrants, even against the defense's wishes. Such instructions are required when, but only when, a jury could reasonably conclude that the defendant committed the lesser offense but not the greater one." (*People v.*

29

*Hardy* (2018) 5 Cal.5th 56, 98; accord, *Wilson, supra,* 11 Cal.5th at p. 295.)  Instruction on a lesser included offense is necessary " ' " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " ' " (*Wilson,* at p. 295, quoting *People v. Valdez* (2004) 32 Cal.4th 73, 115.)  Weak or purely speculative evidence does not suffice.  (*People v. Souza* (2012) 54 Cal.4th 90, 116.)  Put another way, there must be credible evidence " 'from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." ' " (*Ibid.*)

To prove extortion, the prosecution was required to establish that defendant threatened to injure or use force against Oscar, with the specific intent of obtaining Oscar's consent to pay defendant money, and that, as a result of defendant's threat or use of force, Oscar consented to and did give the money to defendant.  (§ 518; see also CALCRIM No. 1830.)  Attempted extortion consists of the specific intent to commit extortion, and a direct but ineffectual act done toward its commission.  (§ 21a.)

The People contend the evidence at trial established only completed acts of extortion because as to each charged act, Oscar paid the money to defendant.  They say, therefore, there was no factual basis to instruct on attempted extortion.  But " '[a] defendant can be convicted of an attempt to commit a crime even though the crime, in fact, was completed.' " (*People v. Hubbard* (2020) 52 Cal.App.5th 555, 568, quoting *People v. Rundle* (2008) 43 Cal.4th 76, 138, fn. 28, disapproved in part on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also § 663 [a "person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was perpetrated"].)

Defendant does not contest the fact that Oscar paid the money in each of the charged counts of extortion. Rather, defendant argues there was substantial evidence Oscar made those payments willingly and voluntarily as part of his undercover informant work for the LAPD, and not out of any fear of defendant. Defendant says that because there was evidence his threats to Oscar were not the *controlling* reason Oscar consented to pay, the court was required to instruct on attempted extortion.

Our supreme court has long held that in order to constitute extortion, "the wrongful use of fear must be the operating cause which produces the consent. . . . 'If some other cause were the primary and controlling one in inducing the consent, then there would be no extortion.' " (*People v. Beggs* (1918) 178 Cal. 79, 88, quoting *People v. Williams* (1899) 127 Cal. 212; accord, *People v. Bollaert* (2016) 248 Cal.App.4th 699, 725; see also *People v. Goodman* (1958) 159 Cal.App.2d 54, 61.) Consistent with this well-settled law, CALCRIM No. 1830 includes the following language: "The term *consent* has a special meaning here. Consent for extortion can be coerced or unwilling, as long as it is given as a result of the wrongful use of force or fear. [¶] The [threat] must be the controlling reason that the other person consented. *If the person consented because of some other controlling reason, the defendant is not guilty of extortion.*" (Italics added.)

Oscar testified about numerous extortion payments he made on his own before he became a confidential informant for Detective Camacho, and that he made those payments out of fear he would be killed if he did not do so. However, the charged acts of extortion in counts 13, 14 and 15 were all based on controlled payments Oscar made *after* he began his work with Detective Camacho. Count 13 was based on a payment made by Oscar to defendant on July 24, 2015. Counts 14 and 15 concerned payments on November 15,

31

2015, and November 30, 2015, respectively. Oscar testified that those three payments, as well as several others, were made while he was wearing a recording device and being monitored by the LAPD. The payments were made with money given to him by the LAPD, and sometimes by the Department of Homeland Security.

There was extensive testimony that Oscar feared defendant and members of MS-13 generally. But Oscar also testified that while he feared for his life, he nevertheless wanted to help the LAPD in its investigation of MS-13 "as a matter of principle." He explained that he grew up in El Salvador well aware of the violent conduct engaged in by MS-13, and those experiences made him unhappy and angry. He said several times during his testimony that he was willing to work as an informant for the LAPD for free because he wanted to help the LAPD, and that no one is entitled to take the life of another.

Even if we assume instructional error, we see no prejudice. We assess prejudice arising from the failure to instruct on a lesser included offense in a noncapital case under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Schuller* (2023) 15 Cal.5th 237, 260; accord, *Breverman*, *supra*, 19 Cal.4th at p. 165; *People v. Banks* (2014) 59 Cal.4th 1113, 1161 (*Banks*); see also Cal. Const., art. VI, § 13.) We do not reverse unless examination of the record demonstrates a reasonable probability the instructional error affected the outcome. (*Breverman*, at p. 165; *Watson*, at p. 836.)

Moreover, "evidence sufficient to warrant an instruction on a lesser included offense *does not necessarily amount to evidence sufficient to create a reasonable probability of a different outcome* had the instruction been given." (*Banks*, *supra*, 59 Cal.4th at p. 1161, italics added; accord, *People v. Beames* (2007) 40 Cal.4th 907, 929; *Breverman*, *supra,* 19 Cal.4th at p. 177.) Where the evidence supporting the jury's verdict of guilt is so relatively strong,

"and the evidence supporting a different outcome [is] so comparatively weak . . . there is no reasonable probability that the claimed error affected the result." (*Beames*, at p. 929.)

While Oscar attested to his willingness and desire to work with the LAPD in its investigation of MS-13, he also consistently testified to his fear of the gang, based on his experiences both in this country and in El Salvador. He stated more than once that he believed he was at risk of being killed if he did not comply with defendant's demands. When extortion payments were made, Oscar was usually outnumbered as defendant ordinarily was accompanied by another member of the Park View clique. Despite regularly making payments on a weekly basis and driving the clique around on demand, Oscar testified to still receiving regular threats from defendant or other MS-13 gang members as late as November 30, 2015. Oscar said he felt "threatened" and "degraded" when those threats were made. Oscar said he remained fearful of MS-13 because of his testimony and believed he was a target and could be killed.

Considering Oscar's testimony in its entirety, there is nothing indicating his fear of defendant and the Park View clique waned simply because he was willing to assist the LAPD and agreed to act as a confidential informant. There were no questions specifically directed to Oscar asking him whether his fear of defendant was eclipsed by the fact he wanted to help the LAPD in its investigation of MS-13. In the absence of testimony on that specific point, we consider the existing record as a whole. We conclude it contains strong, substantial evidence that Oscar feared defendant and that it was the primary, even if not the only, motivation for him acceding to defendant's demands and whims. The jury was correctly instructed with CALCRIM No. 1830 and concluded that defendant's threats were the controlling reason Oscar made the extortion

33

payments, notwithstanding his testimony about willingly working as an informant. We therefore conclude that any instructional error was harmless. Even if the attempted extortion instruction had been given, there is no reasonable probability defendant would have obtained a different outcome.

## 5. Substantial evidence

Defendant contends that substantial evidence does not support the true findings on the gang enhancements, the gang-related firearm enhancement, or his convictions for extortion (counts 13–15), for conspiracy to commit murder (count 9), and for possession of methamphetamine for sale (count 22). When asked to assess whether substantial evidence supports a conviction, we review the evidentiary record according to the familiar standard. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) In conducting our review, we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial. (*Id*. at pp. 57–58.) We do not resolve evidentiary conflicts or credibility issues. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) Applying this standard, we reject defendant's substantial evidence claims.

### 5.1 Extortion

Defendant contends there was insufficient evidence that Oscar made the extortion payments as a result of threats by defendant. As we explained in part 4 of the Discussion above, there was substantial evidence Oscar feared defendant and his many threats. Oscar's testimony was ample evidence in support of all three counts of extortion. "The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless the testimony is physically impossible or inherently improbable." (*People v. Romero* (2019) 44 Cal.App.5th 381, 386; accord, *Young*, *supra*, 34 Cal.4th at p. 1181.) There was nothing physically impossible or inherently

34

improbable about Oscar's testimony. Moreover, his testimony was corroborated in large part by Detective Camacho who attested to the payments made by Oscar while wearing a recording device and being monitored by the LAPD.

### 5.2 Conspiracy to commit murder (count 9)

Defendant argues there is insufficient evidence he harbored a specific intent to kill, which is required for conspiracy to commit murder. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1228.) Defendant says the recording device Oscar wore during the encounter at the 7-Eleven store on December 28, 2015, negates Oscar's testimony that defendant planned on killing the 18th Street gang member. We are not persuaded.

Oscar's testimony as to how the events at the 7-Eleven store unfolded was largely corroborated by the video surveillance footage and the audiotape of the recording device Oscar was wearing at the time. Defendant told Oscar he should not have made a scene inside the store, because he wanted the victim to come outside: "[I]f he had come out, he would have been fucked because [¶] . . . [¶] I was going to stab him there." A reasonable jury could conclude that defendant's own words demonstrated the requisite intent to kill. Defendant asks us to reweigh the evidence and inferences accepted by the jury, which we decline to do. Assessing the credibility of the witnesses and reasonable inferences from the evidence falls within the exclusive province of the jury. (*Young*, *supra*, 34 Cal.4th at p. 1181.)

### 5.3 Possession for sale (count 22)

Defendant argues an essential element of possession for sale is lacking. He says there is no substantial evidence he knew that firearms and drugs were in the San Marino destroyer. We disagree.

There was testimony from multiple witnesses that in December 2015, defendant was the shot caller of the Park View

35

clique who was in control of the San Marino "destroyer." Furthermore, Carlos testified that drugs and guns were hidden at casitas and destroyers, and Oscar testified he made multiple purchases of methamphetamine from defendant, including at least one purchase from that destroyer. There was also testimony that on December 15, 2015, when the LAPD arrived at the San Marino destroyer with an arrest warrant, defendant barricaded himself inside until the LAPD shot gas cannisters inside in an attempt to end the standoff. Detective Camacho testified he saw defendant flee the destroyer after the gas cannisters were deployed. Shortly thereafter, LAPD officers searched the destroyer and discovered several firearms, ammunition, marijuana, and methamphetamine, in addition to other items like empty plastic baggies and a digital scale.

This evidence constitutes substantial evidence supporting the jury's finding of defendant's guilt on count 22. We uphold a conviction against a substantial evidence challenge " 'unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

### 5.4 The gang-related allegations

Finally, in light of our decision to reverse the gang enhancements and the gang-related firearm enhancement as explained in part 1 of the Discussion above, we need not discuss defendant's substantial evidence argument as to these enhancements.

### 6. Sentencing error

The record reflects the trial court failed to impose sentence on counts 14 and 15, two of the extortion counts on which the jury found defendant guilty. As defendant concedes in his reply brief, the appropriate course of action in such circumstances is a remand

36

"for the purpose of pronouncement of a judgment in accordance with the verdict."  (*People v. Taylor* (1971) 15 Cal.App.3d 349, 353.)

In light of the reversal of all gang enhancements, the gang-related firearm enhancement on count 1 and the gang-related indeterminate term on count 13, the superior court, on remand, shall conduct a full resentencing at which it may consider all of its sentencing choices anew.

## DISPOSITION

The true findings on all of the gang allegations and the sentence enhancements imposed under Penal Code section 186.22, subdivision (b) are reversed.  The true finding and the gang-related firearm use enhancement imposed under Penal Code section 12022.53, subdivisions (d) and (e)(1) on count 1 are reversed.  The gang-related determinate term imposed on count 13 under Penal Code section 186.22, subdivision (b)(4)(C) is reversed.  On remand, the superior court shall conduct a new sentencing hearing at which it may reconsider all of its sentencing choices anew.

The judgment of conviction is affirmed in all other respects.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


SCHERB, J.